STATE EX REL. WALDRON V. TOLEDO (CITY) ET AL.

1. LEGISLATURE CANNOT TRANSFER TOLEDO UNIVERSITY TO CITY BOARD OF EDUCATION—ATTEMPTED TRANSFER NO DEFENSE IN MANDAMUS, WHEN.

The legislature is without authority to take the entire control and management of the Toledo university, and its property, from the trustees appointed by the mayor, and pass it over to the city board of education. Hence, it is no defense to a mandamus proceeding brought to compel the city auditor and treasurer to issue and pay a warrant for services performed under a contract made with the trustees of the university, that such contract was made after the legislature had transferred the university to the city board of education.

2. LIMITS OF CITY DISTRICT NOT REQUIRED TO BE COTERMINOUS WITH MUNICIPALITY.

The limits of a city school district are not required to be coterminous with those of the municipality, and whether they are, or are not, will not affect the legal status of either. (Parker, J.)

MANDAMUS.

**I. N. Huntsberger,** for plaintiff:

Section 4105 Rev. Stat., amended May 3, 1904, is merely permissive or directory, and is prospective in operation. Section 28, Art. 2, Const.; Kelly v. Kelso, 5 Ohio St. 198; State v. Staley, 3 Circ. Dec. 294 (5 R. 602).

An officer cannot be removed by the legislature without abolishing the office. State v. Cave, 26 O. C. C. 301; State v. Staley, 3 Circ. Dec. 294 (5 R. 602).

Section 27, Art. 2, Const., prohibits legislature from exercising any appointing power. State v. Kennon, 7 Ohio St. 546; State v. Staley, 3 Circ. Dec. 294 (5 R. 602); Bender v. Cushing, 14 Dec. 65.

The directors of the university are officers within the meaning of Sec. 27, Art. 2. Barker v. State, 69 Ohio St. 68 [68 N. E. Rep. 575]; State v. Kennon, 7 Ohio St. 546; State v. Brennon, 49 Ohio St. 33 [29 N. E. Rep. 593]; State v. Jennings, 57 Ohio St. 415 [49 N. E. Rep. 404; 63 Am. St. Rep. 723]; State v. Halliday, 61 Ohio St. 171 [55 N. E. Rep. 175]; State v. Funk, 8 Circ. Dec. 782 (16 R. 155); Findlay v. Parker, 9 Circ. Dec. 710 (17 R. 294); Mechem, Pub. Off. Sec. 4.

Section 27, Art. 2, cannot be evaded by a change in the name of the office, or by dividing it or assigning its duties to other officers already elected. People v. Porter, 90 N. Y. 68; People v. Albertson, 55 N. Y.

50; Park Commissioners v. Detroit (Common Council), 28 Mich. 228 [15 Am. Rep. 202]; Tiedeman, Munic. Corp. Sec. 18; 1 Dillon, Munic. Corp. Secs. 58, 58a; Fox v. Humane Soc. 25 App. Div. 26 [48 N. Y. Supp. 625).

The legislature has no power to appoint local officers or agents for municipalities, whether they are officers within the meaning of Sec. 27, Art. 2, or not, as such power is executive. State v. Kennon, 7 Ohio St. 546; State v. Denny, 118 Ind. 382 [21 N. E. Rep. 252; 4 L. R. A. 79]; Cooley, Const. Lim. (6 ed.) 206, 208; Cin. W. & Z. Ry. v. Clinton Co. (Comrs.) 1 Ohio St. 77; People v. Lynch, 51 Cal. 15 [21 Am. Rep. 677]; Citizens Sav. & L. Assn. v. Topeka (City), 87 U. S. (20 Wall.) 655 [22 L. Ed. 455]; Mechem, Pub. Off. Sec. 123; 1 Beach, Pub. Corp. Sec. 87; State v. Commissioners, 54 Ohio St. 333 [43 N. E. Rep. 587].

Section 4105 Rev. Stat., also violates Sec. 1, Art. 2, of the constitution of Ohio, because it is mandatory in form and executive in character and denies the right of local self-government and is in excess of legislative power. State v. Commissioners, 54 Ohio St. 333 [43 N. E. Rep. 587]; Commissioners v. State, 50 Ohio St. 653 [35 N. E. Rep. 887]; Western v. Goesling, 30 Bull. 291, dissenting opinion of Minshall and Spear, JJ.; Park Commissioners v. Common Council, 28 Mich. 228 [15 Am. Rep. 202]; People v. Hurlbut, 24 Mich. 44 [9 Am. Rep. 103]; People v. Albertson, 55 N. Y. 50; People v. Lynch, 51 Cal. 15 [21 Am. Rep. 677]; State v. Bader, 5 Circ. Dec. 703 (12 R. 659); People v. Chicago (Mayor), 51 Ill. 17; Atkins v. Randolph, 31 Vt. 226; Dartmouth College (Tr.) v. Woodward, 17 U. S. (4 Wheat.) 518 [4 L. Ed. 629]; People v. Coler, 166 N. Y. 1 [59 N. E. Rep. 716; 52 L. R. A. 814; 82 Am. St. Rep. 605]; Lexington v. Thompson, 24 Ky. Law 384 [68 S. W. Rep. 477]; State v. Fox, 158 Ind. 126 [63 N. E. Rep. 19; 56 L. R. A. 893]; State v. Barker, 116 Iowa 96 [89 N. W. Rep. 204; 57 L. R. A. 244; 93 Am. St. Rep. 222]; State v. Moores, 55 Neb. 480 [76 N. W. Rep. 175; 41 L. R. A. 624]; Cooley, Const. Lim. 47, 206, 209, 281-285, 288-291; 1 Dillon, Munic. Corp. 28a, Secs. 58, 66 to 80; Tiedeman, Munic. Corp. Sec. 18; Mechem, Pub. Off. Sec. 123; State v. Denny, 118 Ind. 382 [21 N. E. Rep. 252; 4 L. R. A. 79]; State v. Denny, 118 Ind. 449 [21 N. E. Rep. 274; 4 L. R. A. 65]; 1 Beach, Pub. Corp. Secs. 30, 87, 712, 729; See Cin. W. & Z. Ry. v. Clinton Co. (Comrs.) 1 Ohio St. 77; State v. Franklin Co. (Comrs.) 35 Ohio St. 458.

Property held in trust by a city for specific purposes, cannot be taken and committed to other agencies, unless its organization as a municipality is destroyed, and then a court of equity will appoint a trustee. Cary Library v. Bliss, 151 Mass. 364 [25 N. E. Rep. 92; 7 L. R. A. 765];

Mt. Hope Cemetery v. Boston (Prop.), 158 Mass. 509 [33 N. E. Rep. 695; 35 Am. St. Rep. 515; New Gloucester School Fund (Tr.) v. Bradbury, 11 Me. 118 [26 Am. Dec. 515]; Montpelier v. East Montpelier, 29 Vt. 12 [67 Am. Dec. 748]; same case at law, Montpelier v. East Montpelier, 27 Vt. 704; Greenville v. Mason, 53 N. H. 515; Board of Education v. Bakewell, 122 Ill. 339 [10 N. E. Rep. 378]; Malone, In re, 21 S. C. 435; State v. Springfield Tp. 6 Ind. 83; Milwaukee (Town) v. Milwaukee (City), 12 Wis. 93; Yarmouth v. North Yarmouth, 34 Me. 411 [56 Am. Dec. 666]; Louisville (City) v. University of Louisville, 54 Ky. (15 Mon., B.) 642; Cooley, Const. Lim. 289, 293.

Distinction between the proprietary and governmental rights and duties of a municipal corporation; the former is measured by those of individuals, the latter by an entirely different standard.

Cincinnati v. Cameron, 33 Ohio St. 336; Western College v. Cleveland, 12 Ohio St. 375; Wheeler v. Cincinnati, 19 Ohio St. 19 [2 Am. Rep. 368]; Robinson v. Greenville, 42 Ohio St. 625 [51 Am. Rep. 857], citing Hill v. Boston, 122 Mass. 344 [23 Am. Rep. 332]; Frederick v. Columbus, 58 Ohio St. 538 [51 N. E. Rep. 35]; Custer v. New Philadelphia, 11 Circ. Dec. 9 (20 R. 177); Dayton v. Pease, 4 Ohio St. 80; Ironton v. Kelley, 38 Ohio St. 50; Circleville v. Sohn, 59 Ohio St. 285 [52 N. E. Rep. 788; 69 Am. St. Rep. 777]; Dayton v. Taylor, 62 Ohio St. 11 [56 N. E. Rep. 480]; Moon v. Middleton, 7 Circ. Dec. 579 (14 R. 498); Gable v. Toledo, 9 Circ. Dec. 63 (16 R. 515); Turner v. Toledo, 8 Circ. Dec. 196 (15 R. 627); Cummings v. Toledo, 5 Circ. Dec. 495 (12 R. 650); Dillon, Munic. Corp. 3a, Secs. 66 to 80, 949; Tiedeman, Munic. Corp. Secs. 8, 9, 10, 11, 13, 15, 18; 1 Smith, Munic. Corp. Sec. 747; Mt. Hope Cemetery (Prop.) v. Boston, 158 Mass. 509 [33 N. E. Rep. 695; 35 Am. St. Rep. 515], citing many cases. Dartmouth College (Tr.) v. Woodward, 17 U. S. (4 Wheat.) 518 [4 L. Ed. 629]; New Orleans v. Water Works Co. 142 U. S. 79 [12 Sup. Ct. Rep. 142; 35 L. Ed. 943]; Tippecanoe Co. (Bd. of Comrs.) v. Lucas, 93 U. S. 108 [23 L. Ed. 822]; New Orleans, M. & T. Co. v. Ellerman, 105 U. S. 166 [26 L. Ed. 1015]; Safety Ins. W. & C. Co. v. Baltimore, 66 Fed. Rep. 140 [13 C. C. A. 375; 25 U. S. App. 166]; Los Angeles Water Co. v. Los Angeles, 88 Fed. Rep. 720; Illinois Tr. & Sav. Bk. v. Arkansas, 76 Fed. Rep. 271 [22 C. C. A. 171; 40 U. S. App. 257]; Beach, Pub. Corp. Secs. 712, 714, 729.

Section 26, Art. 2, Const., requiring uniform operation in laws of a general nature, forbids the classification of cities attemped by Sec. 4105 Rev. Stat.; State v. Spellmire, 67 Ohio St. 77 [65 N. E. Rep. 619];

State v. Jones, 66 Ohio St. 453 [64 N. E. Rep. 424; 90 Am. St. Rep. 593]; State v. Beacom, 66 Ohio St. 491 [64 N. E. Rep. 427; 90 Am. St. Rep. 599]; People v. Lynch, 51 Cal. 15 [21 Am. Rep. 677]; Gulf C. & S. F. Ry. v. Ellis, 165 U. S. 150 [17 Sup. Ct. Rep. 255; 41 L. Ed. 666].

The transfer to the board of education of the trust property held by the city for university purposes, attempted by Sec. 4105 Rev. Stat. and the definition of the word, "university," in Sec. 4102 Rev. Stat., impairs the contract between the city, the University of Arts and Trades, and the original donors, thus violating Sec. 10, Art. 2, Ohio Const., fourteenth amendment to U. S. Const., and Sec. 16, Art. 1, Ohio Const., because it takes the city's property without due process of law. Dartmouth College v. Woodward, 17 U. S. (4 Weat.) 518 [4 L. Ed. 629]; see 1 Rose Notes 929, 931, 955, 957; Tippecanoe Co. (Comrs.) v. Lucas, 93 U. S. 108 [23 L. Ed. 882]; New Orleans (City) v. Water Works Co. 142 U. S. 79 [12 Sup. Ct. Rep. 142; 35 L. Ed. 943]; 1 Dillon, Munic. Corp. Secs. 66 to 80; see note p. 113; Tiedeman, Munic. Corp. Secs. 9 to 18; 1 Smith, Munic. Corp. Secs. 747, 764; 2 Kent's Commentaries 305; Commissioners v. State, 50 Ohio St. 653 [35 N. E. Rep. 887], per Minshall, J.; Cary Library v. Bliss, 151 Mass. 364 [25 N. E. Rep. 92; 7 L. R. A. 765]; Mt. Hope Cemetery (Prop.) v. Boston, 158 Mass. 509 [33 N. E. Rep. 695; 35 Am. St. Rep. 515]; New Gloucester School Fund (Tr.) v. Bradbury, 11 Me. 118 [26 Am. Dec. 515]; Montpelier v. East Montpelier, 29 Vt. 12 [67 Am. Dec. 748]; same case at law, Montpelier v. East Montpelier, 27 Vt. 704; Greenville v. Mason, 53 N. H. 515; Board of Education v. Blakewell, 122 Ill. 339 [10 N. E. Rep. 378]; Malone, In re, 21 S. C. 435; Brownsville v. Basse, 36 Tex. 461; State v. Springfield Tp. 6 Ind. 83; Milwaukee (Town) v. Milwaukee (City), 12 Wis. 93; Grogan v. San Francisco, 18 Cal. 590, per Field, J.; People v. Lynch, 51 Cal. 15; People v. Hurlbut, 24 Mich. 44 [9 Am. Rep. 112]; Park Commisioners v. Detroit Common Council, 28 Mich. 228 [15 Am. Rep. 202]; Spaulding v. Andover, 54 N. H. 38; Grogan v. New York (Mayor), 10 Barb. 223; Bailey v. New York (Mayor), 3 Hill (N. Y.) 531 [38 Am. Dec. 669]; People v. Batchellor; 53 N. Y. 128 [13 Am. Rep. 480]; People v. O'Brien, 111 N. Y. 1 [18 N. E. Rep. 692; 2 L. R. A. 255; 7 Am. St. Rep. 684]; State v. Denny, 118 Ind. 382 [21 N. E. Rep. 252; 4 L. R. A. 79]; Norris v. Abingdon Academy (Tr.), 7 Gill & Johns. (Md.) 7; University of Maryland (Regents) v. Williams, 9 Gill & Johns. (Md.) 365 [31 Am. Dec. 72]; Yarmouth v. Yarmouth, 34 Me. 411 [56 Am. Dec. 666]; Louisville v. University, 54 Ky. (15 Mon., B.) 642; People v. Chicago (Mayor), 51 Ill. 17; Aberdeen Female

Academy v. Aberdeen, 21 Miss. (13 Sm. & M.) 645; Western Sav. Fund Soc. v. Philadelphia, 31 Pa. St. 175 [72 Am. Dec. 730]; Western Sav. Fund Soc. v. Philadelphia, 31 Pa. St. 185; Baker v. Dunning, 77 Tex. 28 [13 S. W. Rep. 617]; Fisher v. School Directors, 48 La. Ann. 1077 [20 So. Rep. 163]; Yazoo v. State, 48 Miss. 440; Mobile & O. Ry. v. State, 51 Miss. 137; People v. Coler, 166 N. Y. 1 [58 N. E. Rep. 716; 52 L. R. A. 814; 82 Am. St. Rep. 605]; State v. Foley, 30 Minn. 350 [15 N. W. Rep. 375]; Detroit v. Railway, 43 Mich. 140; People v. Haws, 37 Barb. 440; New Orleans, M. & T. Ry. v. Ellerman, 105 U. S. 166 [26 L. Ed. 1015]; Paterson v. Society, 24 N. J. Law 385; Baldwin v. New York (Mayor), 45 Barb. 359; Baldwin v. New York (Mayor), 2 Keyes 387; Jensen, In re, 28 Misc. 378 [59 N. Y. Supp. 653]; State v. Haben, 22 Wis. 660: 1 Beach, Pub. Corp. Secs. 714, 724.

Section 4105 Rev. Stat. also violates Sec. 19, Art. 1, Const., because this trust property is private and not public property. The legislature has no greater power over private municipal property than it has over the property of a private corporation whose charter it has reserved power to amend. State v. Neff, 52 Ohio St. 375, [40 N. E. Rep. 720; 28 L. R. A. 409]; Cincinnati v. Cameron, 33 Ohio St. 336; St. Louis v. Hill, 116 Mo. 527 [22 S. W. Rep. 861; 21 L. R. A. 226]; St. Louis v. Dorr, 145 Mo. 466 [41 S. W. Rep. 1094; 42 L. R. A. 686; 68 Am. St. Rep. 576]; Paterson v. Society, 24 N. J. Law 385.

The deed of the university property to Toledo and its acceptance by the city, constitute a contract which cannot be impaired. Fletcher v. Peck, 10 U. S. (6 Cranch) 87 [3 L. Ed. 162]; Pawlet v. Clark, 13 U. S. (9 Cranch) 292 [3 L. Ed. 735]; 1 Beach, Pub. Corp. Sec. 714, and cases, *supra.*

The trust cannot be renounced by the city or taken from it, even with its consent. Drury v. Natick, 92 Mass. (10 Allen) 169; Louisville v. University, 54 Ky. (15 Mon., B.) 642; Allen v. McKean, 1 Sumn. 276 [1 Fed. Cas. 489], per Story, J.; Cary Library v. Bliss, 151 Mass. 364 [25 N. E. Rep. 92; 7 L. R. A. 765].

The unconstitutionality of a statute creating an office, cannot be collaterally urged as to acts done by the officers filling the same, until the act has been judicially declared to be void. State v. Gardner, 54 Ohio St. 24 [42 N. E. Rep. 999; 31 L. R. A. 660]; Gitsky v. Newton, 9 Circ. Dec. 682 (17 R. 484); affirmed, no report, 60 Ohio St. 605; Heck v. Window Glass Co. 8 Circ. Dec. 757 (16 R. 111); State v. Bingham, 7 Circ. Dec. 522 (14 R. 245); Ickes v. State, 8 Circ. Dec. 442 (16 R. 31).

**U. G. Denman** and **C. K. Friedman,** for defendants.

**HAYNES, J.** (Orally.)

A petition was filed, asking that a writ of mandamus issue against those defendants, commanding said defendant Randall G. Bacon, as auditor of said city of Toledo, and his successors in office, to issue and sign a warrant upon the treasurer of said city in favor of relator for the sum of $65 and commanding said Henry M. Barfield, as treasurer of said city, and his successors in office, to pay the amount of said warrant to relator, the same being for services performed by relator as an engineer, he having been employed by the trustees of "The Toledo University," so called. The action is against these officers, claiming that they have failed to perform their duties in not issuing a warrant and paying him for his services, and averring that there are funds existing in their hands properly applicable to the payment of said amount, as he claims.

The real answer in the case is, that the persons who were the board of trustees at the time he was hired, and at the time that these services were performed, no longer existed as a board of trustees, by reason of a certain act of the legislature which took effect on the day of its passage; and, as it was passed prior to the time of the performance of these services, that these officers ceased to have any power or authority in the premises. The officers that are spoken of, were officers who had been appointed as trustees of what was known as the Toledo University of arts and trades, a corporate body that had been organized at the instance of the late Jesup W. Scott, and for the purpose of carrying out certain benefactions which he was intending to give, for the purpose of carrying out and effecting the establishment of this Toledo University which he proposed to establish and for which he gave funds.

The board or rather the university has been leading a rather strenuous life. I believe this is the fourth time it has been before us in one form or another. Its existence has been attacked, and its methods of carrying on business have also been attacked.

The question here is one that we shall pass upon very briefly. In the case of State v. Toledo, 13-23 O. C. C. 327, after full argument of the question, we delivered an opinion in which we set forth the history of this institution, with a very full discussion of the condition of it at that time; and in which we held that it had a legal existence, and that the board of trustees that were then appointed to conduct its affairs, had a lawful right to continue to do so.

Subsequently, in State v. Schauss, 13-23 O. C. C. 283, there is a very lengthy discussion of the powers and duties of the board and a judgment affirming the action of the board in certain matters.

Lucas County.

On the twenty-eighth of May last, in the case of Waddick v. Merrell, 26 O. C. C. 437, the matter was argued again in regard to this board, and an opinion was delivered, in regard to the construction of the word "university" and the powers and duties of the board.

I do not propose to go over again the ground that has been traveled by these cases, or the points made by them. Reference may be had to those for the views of this court, and with the views there expressed we are still satisfied to abide as matters that have been adjudicated so far as this court is concerned. Suffice it to say, that the board of trustees of this institution up to the time of the passage of this act of the legislature was, so far as this court is concerned, a lawful body, and was conducting the affairs of the board in a lawful and proper manner, and that within the definition of the statutes and the definition of the acts of the corporation, it was a university.

The party who brought this action has brought it in the form of a mandamus. Really, it seems to us that if the city intended to attack the lawful authority and existence of that board, the better way to have brought it would have been quo warranto. Still perhaps it is sufficient to aver and perhaps they may aver that the body has ceased to exist, and that therefore so far as its office is concerned, that anything they have done is without authority of law and beyond their powers, and is not obligatory upon any officer of the city of any person having funds of the board in charge.

This controversy arises under a statute passed in April, 1904. It is sufficient to say that under prior statutes, by the action of the board the property of the university had all been transferred to the city of Toledo, and that property remains still in the city of Toledo, as its property, and it took it and made arrangements to carry out the purposes of the original act of incorporation according to the original views of the donor who established the school.

Prior schools or universities similar to this have been established in Cincinnati, and certain powers in regard to them have been transferred to the city of Cincinnati, and the city of Cincinnati is aiding and carrying on and supporting those schools. In the case of Perin v. Carey, 65 U. S. (24 How.) 465 [16 L. Ed. 701], the whole question of the power of the city of Cincinnati to receive and accept any care or control of these schools or universities that have been established, was brought in question, and was decided by the Supreme Court of the United States, and that decision is referred to at length in a case to be found in the Ohio Circuit Decisions, of State v. Toledo, supra. The subsequent act had made the original acts in regard to such matters extended—it extended them to the city of

Toledo—and the city of Toledo has received this property and is carrying on this trust.

Now Sec. 4102 of this statute is found in 97 O. L. 544 and Sec. 4105 is found on page 545 of the same volume. Under these sections certain powers have been given to a certain body and certain definitions made by the legislature, and it is claimed that under and by virtue of these acts, this definition of this grant of power, the authority was taken away from these trustees, and they were deprived of all authority in regard to the administration of this fund or of any powers in fact in regard to the university so called.

The latter part of this Sec. 4102 Rev. Stat. provides or enacts:

"A university supported in whole or in part by municipal taxation, is hereby defined as an assemblage of colleges united under one organization or management, affording instruction in the arts, sciences and the learned professions, and conferring degrees."

Section 4105 Rev. Stat. provides:

"The custody, management and administration of any and all estates or funds, given or transferred in trust to any municipality for the promotion of education, and accepted by the council thereof, and any institution for the promotion of education heretofore or hereafter so founded other than a university as defined by this act, shall be committed to, and exercised by, the board of education of the school district including such municipality, and such board of education shall be held the representative and trustee of such municipality in the management and control of such estates and funds so held in trust and in the administration of such institution, excepting always such funds and estates held by any municipality which are used to maintain a university as defined by this act."

It is claimed that this university of arts and trades came within the definition that is laid down by the statute, in this case, and that therefore the control and management of its funds had passed and did pass on the day the act was passed, which was April 25, 1904, to the board of education of the city of Toledo, the school district through which the board of education has control being composed, in part, of the city of Toledo.

Nor this institution when it was founded by Mr. Scott, was called a university; Mr. Scott was a man of rather large views; he looked into the future rather more than he did into the present. He lived in Toledo when it was a very small village, and yet he saw the possibilities of a very large city; and he lived to see the commencement of it but he did not live to see the fulfillment of it; but he builded according to his conceptions of the future. He laid out and planned for the university. He gave to it property at that time, which he valued at $80,000 and made provi-

sions for the carrying out of a school that should embody his ideas of a certain class of education that should be given or furnished the youths of this city, or country, or neighborhood.

It was small in its inception. He expected there would be future donations. It received at the time that he formed this school some $15,000 in money from Mr. William H. Raymond, which went into the fund and has been in ever since. Certain other parties have made donations to the fund—not to a very large extent—but they still are donations and remain the property that is embodied in this scheme, this school, or university. It was small in its beginning, but I assume Mr. Scott did not expect and could not reasonably expect it would grow to large proportions in a day or in a year, but as the city grew and as its means multiplied, he did expect that donations would be made to the school, and that the school would thrive and flourish as a university.

Primarily it was given to help the arts and trades. Schools were designed for things of that kind; still provisions were made for branching out in other departments. It looked to some extent, evidently from the terms of his grant or deed to the incorporation, which he drew and gave, as if he expected that the university he established would furnish the means for scholars taking a course after they had graduated from the schools of the city, and that they would work to a certain extent in co-operation in carrying out the purposes of this trust.

Now the board of education was elected, in pursuance of the statutes of the state, under a distinct department of the government of the state, recognized as such in the constitution of the state of Ohio—and this department is known as the common-school system in the state of Ohio, being adapted to townships, to school districts, to cities, and to larger districts, but the same objects and purposes being carried out, and that is to educate the children of the state, in the common schools of the state, and to that extent a large fund was provided by the state of Ohio; the money was loaned the state of Ohio, and the interest from it, it has been so provided, was to be for the perpetuity, for the protection and promotion of the schools.

But there are now and always have been universities that are provided for higher degrees of education, for different degrees of education and for different purposes, as the wants of the people or a portion of the people may seem to need; and they are endowed and possess funds that are held for the purpose of sustaining schools and universities.

Now, in regard to this case there has been quite a number of points made by counsel for the plaintiff and authorities cited in quite a large abundance, and arguments have been made on behalf of the city, and

State v. Toledo.

some citation of authority made by them. In regard to this point, in deciding it, I shall be very brief, and I shall not attempt to go over these various points that have been argued by counsel, simply because I do not think it is necessary in the present case. The simple question is whether this board had authority to create a debt in favor of Mr. Waldron.

We think this case has been decided in the state of Ohio in principle, by the Supreme Court of this state, to say nothing of the cases that were cited by that court, and the great body of cases that may be cited in other states, and the Supreme Court of the United States, to say nothing of those general principles of law which have been maintained in England in regard to this same class of schools, or charities, as they are sometimes called. In the case that I have referred to, State v. Toledo, *supra,* is cited what is known as the Dartmouth College case, and the principles which have been laid down by the Supreme Court of the United States. I shall not refer to those cases.

Now this case to which I refer, is denominated State v. Neff, 52 Ohio St. 375 [40 N. E. Rep. 720; 28 L. R. A. 409], was decided on March 12, 1895, by the Supreme Court. The facts of course are not just the same as they are in this case, but the principles which are announced and which underlie the decision are the same, because in their very nature, they may be said to be eternal in regard to this class of institutions.

In that case there was a school in Cincinnati, called Cincinnati College. It was established at an early day and ran rather a varied course. It was intended that there should be no limitation as to what might be taught in the schools, and they started with several matters, as I understand. They tried medicine and they tried other matters and finally they tried law; and they established a law school which was under Mr. Timothy Walker's direction in his day, and it came to be a very large school, and it has continued to be so until recent times, and a very large number of lawyers in Ohio are educated in that school. That was a success. It was supported and maintained. I speak from history and not from the report.

Some people had become dissatisfied with the manner in which the school had been conducted, and thought they ought to have some different teachers and some different methods of teaching. Some people were taught in other colleges and they thought the system that was taught in the college they were in was adapted to better purposes, than the instruction in the law school, and it finally came about that they established another school. Perhaps the university or Cincinnati school had been established some little time before. When the time came around, they sought to get control of the law school and they caused an act to be passed, and

an act was passed by the general assembly of the state of Ohio, 89 O. L. 647, that amended Secs. 3, 4 and 5 of the act incorporating Cincinnati College, passed January 22, 1819, 17 O. L. 46, and it provided:

"Section 3. The affairs of the said Cincinnati College shall hereafter be under the management of the directors, for the time being, of the University of Cincinnati, which directors shall be, and they hereby are constituted the board of trustees of the Cincinnati College, and they are hereby anuthorized to exercise all the powers granted by law to the board of trustees of the Cincinnati College.

"Section 4. *Be it further enacted,* that the management of the funds, and of other matters belonging to or connected with the said Cincinnati College, shall be solely in the hands of the board of trustees aforesaid, and the said funds shall be administered for the purpose of carrying out the objects of the charter of the Cincinnati College, in connection with the funds and administration of the University of Cincinnati.

"Section 5. The board of trustees shall appoint a treasurer, who shall give bond and security for the faithful performance of his duty; they may elect a president and vice president of the college, and appoint such professors and tutors as they shall think necessary; which president, vice president, professors and tutors may be removed at the pleasure of the board; they may, from time to time, make and enforce such rules, regulations and by-laws for the government and well-being of the college as may seem to them proper, provided they be consistent with the laws of the United States, and of this state; they may appoint a faculty to consist of the president, vice president, professors and such other persons as they may judge necessary, and may vest in the faculty so appointed such powers as they may think expedient for the preservation of good order, and for enforcing obedience to the rules, regulations and by-laws of the institution; they may cause the principles of morality and of the christian religion to be included, but the religious tenets that may be peculiar to any particular sect or denomination, shall never be taught or be enforced in the college."

Then it provides for holding their meetings, and it has a proviso, "that the funds of the institution shall not be applied to any use, or for any purpose not herein expressed or intended." And they repeal the act incorporating Cincinnati College, and provide that that act shall be in force and take effect from and after its passage.

In deciding these matters, Judge Bradbury, in giving the opinion of the court, proceeds to state the views of that court in regard to the case, and it seems entirely proper that I should read that decision although

State v. Toledo.

it is a little long; but it states the law which governs this case. (See State v. Neff, 52 Ohio St. 375 [40 N. E. Rep. 720; 28 L. R. A. 409], opinion by Bradbury, J., commencing with last paragraph, page 400 and ending on page 408.) In that case, they declared the law to be unconstitutional.

It appears in evidence that the original property that was donated by Mr. Scott, and by others with him, still remains as the property of this institution. It is true that the control of it was transferred to the city of Toledo, and is in their hands subject to the donor's trust, accepted as such, and is subject to this trust as we have already held. It will be seen that this statute seeks to take from the trustees appointed by the mayor of the city of Toledo, the control of this property and pass it over to another board, to wit, the board of education. We are clear in our views, that the legislature had no authority whatever to authorize this. They had no right to take this property, to control this property, or this school, in any manner or form, from these trustees, and pass it to the board of education. As to them, that board of education is a foreign board and separate and distinct, and they might as well have passed it to some other board—the county commissioners—or any set of men that they had seen fit, as to have passed it to the board of education. The board of education, is has been held in this state, is not a corporation. It consists of certain trustees. It simply takes those trustees, and in the language of the statute, makes them the representatives of the city of Toledo. They have done exactly what was done in this case of Cincinnati College. They put the trustees of the board of education in place of the trustees of this board, and they say that they shall vote for and shall carry out the management and control of this institution.

We do not think it is necessary to pass upon the definition of the word "university." I do not think that has any bearing whatever on this present case. The school was started as a university. It was intended to be such in the future. It was intended to have different departments, but back of that it was a school established by a private donor to carry out his purposes and his views in regard to education, and was endowed by his property, and by the property of others who donated it with him, and that property, whether you call it a "university" or a polytechnic school, is a corporation that owns property, and is to be protected by the constitution of the state of Ohio, which declares that private property shall ever be held inviolate. If this incorporation had $1,000,000, it would not make any difference in the principles involved. A mandamus will be awarded in this case.

**Hull, J.,** concurs.

## PARKER, J.

I want to say, with respect to the board of education being an entirely distinct body and the school district being entirely distinct from the municipality under the statute, the fact that the governing body of the former is called the "board of education of the city of Toledo" may tend to create confusion; but when we come to think of it, though the limits of the school districts may be coterminous with those of the corporation, it appears that in this case they are not precisely so, and the law does not require that they shall be so; and the fact that they may, in a given case, be exactly coterminus would not change the legal status of the two bodies. They are created by the law to perform entirely different functions from those performed by the city government. They represent a different electorate; not only may they be chosen by people, some of whom reside outside the city limits and some within the city limits, but the electors are not the same, for now, under the law, women are authorized to vote for members of the board of education. They are officers, in the choice of whom the city as such, has no voice whatever, either directly or indirectly. It may be expedient, it may be wise to put this school under the management of the board of education; but we are all of the opinion that it cannot be legally done in the way it is here attempted. If these statutes were put in form, so that the city, through some board or officer, or through its electors, might voluntarily choose the board of education to manage this school, for my part, I am not prepared to say that that would not be entirely legal or regular; but we are clear that where the legislature undertakes to do it so as directly to deprive the city of all voice in the matter, the attempt must fail for the reasons stated by Judge Haynes.